Per Curiam :
This case was referred pursuant to Eule 45(a) to Saul E. Gamer, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law, which the commissioner has done in a report filed November 13, 1959. Exceptions to this report were taken by defendant and briefs were filed with the court by both parties. Argument by counsel was made before the court, and upon consideration thereof, together with the record made and the exceptions and briefs filed, the court, being in agreement with the findings and conclusions made by the commissioner, hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case. It is therefore concluded that the plaintiff is entitled to recover. The amount of recovery will be determined pursuant to Eule 38 (c), and such recovery will not include any costs or expenses involved in the original incorporation of tree symbols in plaintiff’s sketches.
It is so ordered.
*231 OPINION OF COMMISSIONER
Plaintiff entered into a contract to prepare eight lots of geodetic control sketches for the Army Map Service (AMS). Over 19,000 sketches were ultimately made by plaintiff and the controversy now before the court arises out of the rejection by defendant, during the course of contract performance, of certain lots comprising approximately 6,200 sketches, and the requirement by defendant that these lots, as well as the balance of the lots, be prepared to higher technical standards. Plaintiff contends that the rejected lots in fact met the contract specifications, that their rejection was therefore a breach of contract, and that the additional contract work on these and the remaining lots which plaintiff was required to perform should have been paid for by way of an equitable adjustment in accordance with the contract terms. Plaintiff’s claim was rejected both by the contracting officer and the Armed Services Board of Contract Appeals. So many sketches being involved, and the calculation of the amount of increased expenses caused being therefore so complex, the parties agreed, with the commissioner’s approval, that only the question of liability would be initially determined.
Plaintiff was to prepare the sketches from so-called source material, consisting of sketches of certain Eussian areas which were prepared by the Germans under battle conditions. Some of the sketches consisted of profiles of buildings, but most were planimetric. Plaintiff was to copy the German sketches (omitting certain designated parts therefrom) in accordance with numerous detailed specification requirements. It was an urgent, large-scale drafting task, to be completed in approximately TO days. Despite the many specification provisions, however, it was recognized that it was not possible to include every drafting detail and that close coordination between plaintiff’s organization and AMS would be required in order to prepare the sketches so that they would be satisfactory for their intended use. Because of the extreme urgency of the project and the large number of sketches involved, plaintiff planned, with defendant’s knowledge, an assembly line process involving ap *232 proximately 40 employees, with, one group of draftsmen engaged only in sketching the buildings, another performing only such linework as depicting roads, rivers, and brackets indicating distances, another doing only lettering work, and another doing only final inspecting and editing.
Contract performance commenced on February 24, 1955, with the sketches designated as Lot 16 being the first placed into production. About a week later, plaintiff’s official in charge of the project encountered certain problems regarding various drafting details, and requested AMS to send a representative to plaintiff’s plant in Aurora, Illinois, to inspect its operation and to offer guidance, and an AMS employee who was thoroughly familiar with the project and its requirements was sent to plaintiff’s plant for this purpose. This employee remained at the plant during 3 days, March 8, 9, and 10. He examined the work being performed and gave various instructions and suggestions. Among other things, he gave directions concerning the symbols to be used in designating evergreen and deciduous trees, the lightening of the shading on the building profile sketches, the manner of depicting road intersections, the avoidance of crowding of lettering or symbols, and the elimination, despite their existence on the source material, of arcs to indicate right angles. He gave no indication that the work being done was not, on an overall basis, satisfactory and in accordance with the contract specifications. On the other hand, he specifically directed that the instructions and suggestions he was making were not to be applied where to do so would cause any completed or in-process work to be redone. Since this was the early stage of the contract, there was still plenty of time to apply the recommendations to the bulk of the contract sketches. At that time Lot 16 had been practically completed, and Lots 10 and 11 were in process. Several hundred sketches from Lots 10 and 11 were examined by the AMS representative. On the same day that such representative left the plant, March 10, plaintiff shipped Lot 16, consisting of approximately 1,800 sketches. This was the first lot shipped under the contract. No complaints were made to plaintiff by AMS about this lot. It was accepted as complying with the contract specifications and ultimately a formal acceptance in writing was made by *233 the contracting officer by a communication which stated that “the sketches are of acceptable quality and are in compliance with the technical provisions of the Contract Specifications.”
On March 16,1955, which was approximately a week after Lot 16 was shipped, plaintiff shipped Lot 11, consisting of approximately 2,100 sketches. Two days later, March 18, it shipped one-half of Lot 10, consisting of approximately 1,400 sketches. These were the lots that were in process when the AMS field representative was at the plant and were in part examined by him. The remainder of Lot 10 was shipped March 22, and one-half of Lot 9, consisting of approximately 1,250 sketches, was shipped on March 26. In the meantime, plaintiff had received a communication from the contracting officer dated March 21, 1955, confirming various “decisions” made by the AMS representative during his visit and also confirming the representative’s instruction concerning the nonretroactivity of his directions, the letter stating “It is emphasized that these practices are not to apply to work already accomplished unless their use would materially improve the sketches.” The letter further made comments and suggestions with respect to eight sketches prepared by plaintiff which the representative took with him and which the contracting officer returned. The letter stated, however: “These sketches as prepared by your office are acceptable.”
However, on March 28, 1955, plaintiff’s official in charge of the project was advised by telephone by an authorized AMS official that many of the sketches in Lots 11, 10, and 9 recently shipped, as set forth above, were unsatisfactory and would have to be redrawn or corrected. The next day, March 29, plaintiff’s official went to Washington and conferred with AMS officials about the matter. Complaints were made by the AMS officials about various items, such as the lettering and the draftsmanship of brackets used to indicate distances, and including some of the identical matters which the field representative’s instructions and the confirming letter of the contracting officer directed not be incorporated if they required any completed work to be redone, such as the elimination by plaintiff of concentric arcs indicating a 90° angle, the method of indicating road inter *234 sections, the manner of distinguishing between evergreen and deciduous trees, and the degree of heaviness of the shadings on the buildings. Plaintiff was directed to prepare all future sketches in accordance with the instructions they gave, including the elimination of the concentric arcs, and the lightening of the building shadings so as to give a more etched appearance. All the sketches in the three lots were returned to plaintiff and, as a result, plaintiff was required to redraw and rework a great number of them, as well as a number in other lots which had already been completed or were in process. In addition, plaintiff prepared the remaining lots under the contract in accordance with the directions and instructions given by the AMS officials during the conference of March 29. As ultimately resubmitted, Lots 11, 10, and 9 were accepted as meeting the contract specifications, as were all the remaining lots. The AMS official who had spent the 3 days at plaintiff’s plant participated in the AMS decision that the lots should be rejected, and was in large part responsible for causing their rejection.
For the following reasons, the conclusion is compelled that the sketches in Lots 9, 10, and 11, as originally submitted, did in fact comply with the specifications, and that if the AMS officials later wished them to conform to a higher degree of technical standard, they should have issued an appropriate change order to such effect. These sketches were of quality at least equal to those in Lot 16, which contained none of the refinements insisted upon by AMS at the March 29 conference, and which defendant nevertheless accepted as meeting the specifications. Indeed, they were unquestionably better than those in Lot 16, for that lot was substantially complete at the time of the AMS representative’s visit, while parts of the lots in question were in process at that time, so that plaintiff was still able to incorporate in such parts some of the representative’s suggestions. The AMS representative gave no indication during his extensive stay at the plant that either Lot 16 or the lots in question were not acceptable. Indeed, the clear inference was that they were in fact acceptable, because of his express direction not to change any sketches already completed, a direction confirmed by a letter over the signature of the contracting officer *235 himself. The only conclusion that could rationally be drawn was that, although the sketches could in the AMS representative’s opinion be improved by adopting the suggestions he made, they were adequate to meet the contract specifications as they were and without change. And this conclusion was in fact confirmed by the subsequent actual acceptance of Lot 16 as being in compliance with the specifications. And yet, when Lots 9, 10, and 11 were submitted, drawn by the same draftsmen, and to the same or better standards than Lot 16, they were rejected as not complying with the specifications. Such action cannot fairly be sustained.
Defendant contends that the rejected Lots 9, 10, and 11 were not of as good quality as Lot 16. However, all the probative evidence is the other way and to the effect that the lots were, on the other hand, better than Lot 16. While all of the Lot 9, 10, and 11 sketches originally submitted and rejected are no longer available, having been destroyed in accordance with a contract requirement, copies of some prints from these rejected lots which were used as a basis for the reworked sketches survived and are in evidence. There can be little room for doubt that they were of quality comparable to Lot 16. Indeed, no reason is apparent why they should not have been, since they were made under the same conditions, and by the same draftsmen. In addition, they were made at a later time than Lot 16 and after more experience, therefore, had been obtained by the draftsmen. Further, as shown, they reflected in good part the suggestions and recommendations of the AMS representative, the lots having been in the process stage during his March 8-10 visit.
Defendant further contends that actually Lot 16 was also not of good quality and was accepted only because of the extreme urgency involved, so that plaintiff gains nothing by proving the comparability of the rejected lots with Lot 16. In support, defendant now points to certain corrections it made on some sketches in Lot 16 with its own personnel rather than to take the time to return them to plaintiff for correction. It maintains that its waiver of plaintiff’s unsatisfactory work on Lot 16 did not serve to preclude it from rej ecting the alleged equally unsatisfactory Lots 9, 10, and 11. And further, defendant goes on to assert the alleged unsatisfactory *236 nature of plaintiff’s performance on the entire project, pointing to a number of alleged deficiencies in practically all of the lots plaintiff submitted, including the corrected Lots 9, 10, and 11. These contentions cannot be accepted. They are at once inconsistent not only with the contemporaneous formal communications over the signature of the contracting officer that the sketches now complained of “are of acceptable quality and are in compliance with the technical provisions of the Contract Specifications”, but also with the specific admissions made by defendant’s witnesses both at the administrative board hearing and at the trial in this court that Lot 16 was acceptable and did meet the standards of the contract specifications. Another letter from the contracting officer during contract performance stated that “the quality of the work was good.” At the time of submission, defendant made no complaints to plaintiff about Lot 16 or any other accepted lot, nor even advised it that changes were being made on any sketches. Its own witness at the board hearing described the alleged deficiencies as “minor”. (Board Tr., p. 252.) It is not surprising that in over 19,000 sketches prepared on an urgent basis, minor corrections on some sketches may have been considered advisable. But minor deficiencies on a few sketches, unreported to plaintiff, cannot now be accepted as the basis for asserting, in the face of defendant’s written contemporaneous and oral trial admissions, that the overall quality of plaintiff’s work on accepted Lot 16, or any of the other accepted lots, was below contract requirements and that in fact defendant was lenient in accepting them. In these circumstances, doctrines pertaining to waiver are inapplicable.
Defendant relies on the broad provisions of section 1-13 of the specifications vesting in the contracting officer the right to reject for a number of specified reasons or for “any deficiencies which in the opinion of the contracting officer would adversely affect the reproduction quality * * It is elementary, of course, that broad “opinion” or “satisfaction” clauses in contracts of this type must necessarily be given wide scope. Nevertheless, it is equally elementary that the discretion involved must be exercised reasonably and fairly. United Wholesalers, Inc. v. A. J. Armstrong *237 Co., 251 F. 2d 860, 862 (Ct. App., 4th Circ.); Adamson v. Alexander Milburn Co., 275 F. 148, 157 (C.C.A. 2d) ; McNeil v. Armstrong, 81 F. 943 (C.C.A. 4th). Such a provision does not permit the contracting officer arbitrarily to accept work of a certain quality as meeting the specification standards, but at the same time to reject work of identical or even better quality as not meeting such standards.
Defendant further maintains that since plaintiff reworked Lots 9, 10, and 11, and prepared the remaining lots, to the higher standards imposed by defendant, all without formal protest or complaint and without a written order, it is in any event precluded from recovering. However, under article 2 of the contract, entitled “Changes”, the contracting officer was empowered to receive and act upon claims of this kind “at any time prior to final payment under this contract.” The contract was kept open under this provision for the express purpose of permitting plaintiff to make this claim. The contracting officer received and considered the claim on its merits, as did the Appeals Board, without any point being made as to lack of protest, timeliness of the assertion of the claim, or lack of a written order. Under the express contract provisions, as well as the circumstances involved in the processing of the claim thereunder, this defense is, therefore, not well taken. Palumbo v. United States, 125 Ct. Cl. 678, 689; Arundel Corporation v. United States, 96 Ct. Cl. 77, 111. A formal protest against performing work not required by the contract is of particular importance in instances in which orders are given by subordinates, without the knowledge or authorization of the contracting officer. A protest to the contracting officer thus serves as a protection to the Government against additional contract costs unless authorized by duly empowered officials. The case upon which defendant places chief reliance, J. A. Ross & Co. v. United States, 126 Ct. Cl. 323, was of that type, the court noting: “Contracting officers are rarely on the ground where the work is going on, and the Government by these provisions [concerning equitable adjustments or compensation for extra work] undertook to protect itself against claims for additional compensation because of an act of a subordinate of the contracting officer, which re *238 quired something to be done not called for by the contract.” (p. 330) There is no such problem here. In addition to the contract provision above mentioned specifically permitting the contracting officer to entertain claims of this type prior to final payment, which he here did, the rejection was made by AMS officials duly authorized by the contracting officer to so act, and without the need of obtaining any further consent from him or any other AMS official. The contracting officer frankly admitted in his testimony before this court that he knew little about the technical matters relating to contract performance, and relied upon and delegated to his assistants such matters as the rejection of contract work. It was the AMS field representative who, together with his superior who was responsible for the general supervision of the contract, made the initial determination to reject the lots in controversy and to require work of more exacting standards after the acceptance of Lot 16. Defendant has never contended that these technically qualified and responsible officials were not fully authorized to take these actions on behalf of the contracting officer. And since defendant was asserting that the additional work it was demanding was not in excess of that called for by the specifications, it was obvious that it would not have issued a written change order requiring its performance. A demand for one would therefore have been meaningless. Virginia Engineering Co., Inc. v. United States, 101 Ct. Cl. 516, 533; Fleisher Eng. & Const. Co. v. United States, 98 Ct. Cl. 139, 158.
Finally, defendant contends that in any event no liability can be imposed upon it because of the specification provision (1-06) which reads:
risk — The Contractor shall assume all risks in connection with the execution of this contract and waive any claim against the Government for damages arising out of the performance of the work specified and shall agree to protect and save harmless the Government from any claims from damages which may result from injuries to property or persons in connection with this work.
This provision cannot possibly be construed so as to insulate defendant from liability for any and all acts on its part which might constitute breaches of the contract or otherwise *239 give rise to justifiable claims under the contract. Such an interpretation, hardly consistent with the “rational intention of the parties,” would certainly present “a serious question of public policy” and, therefore, of the validity of the provision. Ozark Dam Constructors v. United States, 130 Ct. Cl. 354, 359-360. The provision was clearly intended to provide immunity to the Government only as to claims by third parties for damages for injuries arising out of plaintiff’s performance of the contract.
Upon the entire substantial record in this case, the conclusion is inescapable that, although plaintiff’s work on the first Lot 16 and the subsequent rejected Lots 9, 10, and 11 was initially regarded as meeting the contract specifications, defendant, for reasons best known to itself, suddenly decided to upgrade the technical standards of the work to be performed. When, during his long visit at plaintiff’s plant, the AMS field representative directed plaintiff not to incorporate any suggested changes in any completed work, which included Lot 16, which was then practically complete, as well as parts of Lots 11 and 10, which were then in process, the plain inference was that they were acceptable, as was borne out by the subsequent actual acceptance of Lot 16. The letter of the contracting officer received shortly after the visit confirmed the direction concerning the nonretro-activity of the recommendations. The additional clause “unless their use would materially improve the sketches” contained in the letter in this regard is of no importance if the work was in fact acceptable without the incorporation of the recommendations, as the subsequent acceptance of Lot 16 as meeting the specification requirements proved was the situation. None of the suggestions were incorporated in Lot 16. Thus, plaintiff was instructed at the time not to redo any work, but later the sketches were rejected and the changes were required to be made anyway at a time when it was more difficult and expensive to make them, with the entire sketch being required to be redone in many instances. Under these circumstances, it could hardly be considered fair dealing to instruct plaintiff not to make changes, to permit it to complete the work in process, and then order it to make the changes after all at a later time when the *240 work was completed and at greatly increased expense. It is not possible to conclude that defendant’s officials intentionally indulged in such inconsiderate treatment of the contractor, but had they deliberately planned to trap plaintiff into completing and submitting work which was destined for rejection, they could not have been more successful. What is the more inexplicable is that the very AMS official who examined the work in process and instructed plaintiff to send it in without change was largely responsible for its rejection. It matters not, as defendant contends, that this official was employed in the Inspection Section and that “inspectors” are not authorized to accept work in the field. This official may have sometimes been referred to as an “inspector”, but at least for the purpose of this contract he was vested by the contracting officer with powers which went beyond those ordinarily associated with an “inspector.” Although employed in the Inspection Section, his official title was that of cartographer, and he was considered to be an AMS field representative. He was sent to plaintiff’s plant by the contracting officer for the express purpose of giving guidance and any necessary instructions and directions. The incongruity of saying that this official could not accept work in the field, but could reject it immediately upon returning to the home office, is obvious. In any event, even if he had no power to accept work in the field, it is undisputed that he was fully qualified technically, was wholly familiar with the contract requirements, and was selected to be sent to plaintiff’s plant as the AMS representative who could give the necessary guidance and directions. The decisions he arrived at in plaintiff’s plant were all confirmed in writing by the contracting officer. His direction to submit the work in its then form is at the very least the strongest kind of evidence of its actual compliance with the specifications. If he knew he would reject the work after he returned to Washington, he should not have ordered plaintiff to complete and submit it, for by his own admission at the trial the lots rejected in Washington were no worse than the sketches he examined at plaintiff’s plant in Aurora.
If, although plaintiff’s work did meet contract specifications, defendant’s officials later decided that it should be *241 redone to higher technical standards, and that the balance of the contract work should also conform to such standards, defendant should have been prepared to pay for the increased costs and expenses involved in causing the work already completed to be redone and in performing the remainder of the contract to such higher standards. Its failure to accept Lots 9,10, and 11 was a breach of contract, Joseph A. Holpuch Co. v. United States, 104 Ct. Cl. 58, 82, and an appropriate change order to compensate plaintiff for the changed requirements it imposed with respect to these lots, as well as the balance of the lots submitted under the contract, should have been issued under the contract. MacDougald Construction Company v. United States, 122 Ct. d. 210, 256-257. Based on the record before the Appeals Board, as well as the additional evidence introduced in the trial proceedings in this court, the Board’s decision to the effect that plaintiff was not “required to perform any work not required by the applicable contract specifications” and that plaintiff was not “required to correct or replace any sketches that complied with the contract requirements” is grossly erroneous, and is not substantially supported by the credible and probative evidence. Fehlhdber Corporation v. United States, 138 Ct. Cl. 571, cert. den., 355 IJ.S. 877. However, it should be said in this connection that the bulk: of the Board’s consideration and decision was directed to an issue which plaintiff has now waived and is therefore no longer in the case. This was the issue concerning plaintiff’s contention that it was not required by the specifications to depict any trees and that defendant so advised it prior to its bid, but that, after it was awarded the contract, it was required to include tree symbols in the sketches. The Board held against plaintiff on this issue, and its decision in this respect was well substantiated. The further evidence taken on this issue in the trial before this court affirms the correctness of the Board’s decision on this question, and, as stated, plaintiff now abandons this claim.
It is recommended that plaintiff be entitled to recover, the amount of the recovery to be determined in further proceedings pursuant to Buie 38(c), such recovery, however, *242 not to include any costs or expenses involved in the original incorporation of tree symbols in the sketches.
FINDINGS OF FACT
1. Plaintiff is a corporation organized under the laws of the State of Illinois, with its principal place of business in Aurora, Illinois. It has for many years been engaged in the business of drafting and preparing engineering drawings, prints, maps, tracings and similar materials at its plant in Aurora.
2. Under date of February 1, 1955, the Army Map Service (AMS) issued invitations for bids for the preparation of geodetic control sketches of Russia. The entire project, consisting of approximately 22,300 individual sketches, was divided into nine lots varying, approximately, from 1,800 to 2,900 sketches in each lot. Certain sketches depicted open areas with roads, streams, and vegetation. Others were of structures such as churches, sizable buildings, and windmills. The material from which the sketches were to be copied, referred to as the source material, which was Government furnished, had been prepared by German trigonome-trists under battle conditions. Through repeated reproductions and numerous handlings portions of the source material had become dim or had otherwise lost much of its depiction. Translations were lacking on the source material in some instances. The contractor, by using pen and ink, was to reproduce the sketches on paper.
3. The invitation for bids contained a provision which required prospective bidders to review the original source material from which the sketches were to be drawn prior to bidding, as follows:
inspection: Source materials for the projects are available for inspection in the Cartographic Division, Army Map Service, 6500 Brooks Lane, Washington 25, D.C., during normal working hours beginning 3 February 1955. No bidder’s quotation will be considered unless he has made a prior examination of the materials for these projects. The bidder shall satisfy himself as to the character and quality of the work required under the projects; any failure by the bidder to acquaint himself with all the available information will not relieve *243 him from responsibility for estimating properly tlie difficuty or cost for successfully performing tbe work.
In compliance with the prebid inspection requirement, about the middle of February 1955, plaintiff’s vice president, accompanied by its sales representative, inspected the source material. An AMS employee was on hand to answer their questions about the project. Within a day or two following the inspection, plaintiff submitted a bid.
4. Plaintiff’s bid was accepted with respect to eight of the nine lots and, under date of February 18, 1955, plaintiff and defendant, acting through a contracting officer of the Army Map Service, Department of the Army, entered into Contract DA 49-018-eng-1255. The contract required plaintiff, in consideration of a contract price of $11,810.44, to prepare approximately 19,000 small geodetic control sketches (2.85 inches in height and 2.33 inches in width), divided into eight lots varying from approximately 1,800 to 2,900 in each, of Russian territory from source material prepared by the Germans as set forth above. The sketches were to be used by AMS in its preparation of geodetic survey control cards, which, in turn, were to be compiled into a final composite product known as a “Trig List”. The geodetic control sketches to be drawn by plaintiff were intended to provide a graphic illustration of the area around survey control points and to aid in the location of those points on the ground by survey personnel. 93.61 percent were planimetric sketches of open areas showing roads, streams, and vegetation; the remaining 6.33 percent were profile or elevation sketches of buildings and other structures. The work was of extreme urgency and the contractor was required to complete the contract in about 70 days. One-half of each lot was to be delivered to AMS, Washington, D.C., on or before April 1, 1955, and the balance on or before May 1,1955.
5. The contract included the following pertinent provisions :
corrections : Because of the urgency of the requirement, corrections to completed work delivered, if required, will be made by the contractor at the Army Map Service.
*244 2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
3. EXTRAS
Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer.
$ ‡ $
5. INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
sfc íjí }{i
(d) The inspection and test by the Government of any supplies or lote thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be dis *245 covered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
* Hi * * *
23. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive; 'provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
6. The contract provided that the work would be performed in accordance with Army Map Service Specifications No. 55-13, the pertinent parts of which are as follows:
Section I — General Provisions
1-01. GENERAL — The work to be done under these specifications consists of furnishing all services, materials (except those listed in paragraph 1-04), supplies, plant, labor and superintendence required to execute and finish all work necessary to deliver to the Army Map Service the geodetic control sketches as described in Section II of these specifications.
1-02. components op Specifications — These specifications consist of Section 1, General Provisions, Section II, Technical Provisions (Parti).
*246 1-03. work to be done — Work to be done consists of:
a. Drafting the geodetic control sketches which will comprise one sketch for each original (native) sketch furnished and additional sketches as indicated.
1-04. PROPERTY TO BE FURNISHED BY THE GOVERNMENT— The property to be furnished by the Government, f.o.b. Contractor’s plant, will consist of:
a. Original control sketches.
b. Type and prepared cuts as required.
*****
1-06. risk — The Contractor shall assume all risks, in connection with the execution of this contract and waive any claim against the Government for damages arising out of the performance of the work specified and shall agree to protect and save harmless the Government from any claims from damages which may result from injuries to property or persons in connection with this work.
1-07. inspection — Each item called for in these specifications is subject to inspection by the Contracting Officer before acceptance, to insure that it has been prepared and finished in the maimer set forth in the specifications. * * *
1-08. QUALITY
a. All items shall be drafted using the best quality black ink or other drafting fluid to insure uniform opaqueness of the data shown and so that the ink will not chip during normal handling.
b. All material and workmanship under this contract shall be of high quality. Preparation of control sketches shall be done with neatness and clarity. All drafting shall conform to the weights and gauges prescribed in these specifications. Allowable tolerances are indicated in Section II of these specifications.
1-09. tests — Tests will be made by the Contracting Officer of each item furnished under the terms of this contract to insure that all items comply with the criteria of accuracy and type of materials set forth in these specifications.
1-10. ACCURACY
a. Geodetic control sketches. The outer limits of any tick indicating the overall limit of sketches shall not exceed .03 inch in displacement when any two orientation ticks on the same sketch 'are superimposed on their intended position on the card form. All features on the control sketches shall be shown in the same position (relative to detail) and alignment as shown on the original sketches, with due modification and exaggera *247 tion of detail as specified in Section II, part 1, of these specifications.
* * * * *
1-12. acceptance — Upon receipt of all sketches, the Contracting Officer will notify the Contractor of final acceptance or rejection of any item within thirty (30) calendar days after final receipt of all drawings by the Contracting Officer.
1-13. rejection — Any deficiencies such as the following shall be sufficient cause for rejection: non-conformity of weights, gauges and spacing; grey lines, grey type and/or grey fills; improper plotting; improper selection and/or placement of type stick-up; poor free-hand drafting of symbols such as buildings; uncompleted edits; unmade or poorly made corrections. Any other deficiencies, which in the opinion of the Contracting Officer would adversely affect the reproduction quality, shall also be cause for rejection. All rejected material shall be returned to the Contractor at the Contractor's expense.
* * * * *
Section II, Part 1 — Technical Provisions
2-01. GENERAL
a. These specifications cover the preparation of geodetic control sketches. A geodetic control sketch is a supplement to information shown on Army Map Service control data cards.
b. The basic data to be used in producing the nine lots of geodetic control sketches required are the original control sketches with information and instructions added in red and/or black pencil. One sketch shall be drafted for each original sketch furnished and additional sketches will be drafted as indicated on the original sketches. For instance, if a pencil notation on the original sketch says “Draft 2”, one additional sketch will be made; if the notation says “Draft 3”, two additional sketches will be made, etc. Where more than one sketch is drafted, the number of the additional sketch is indicated in pencil in some instances, in other instances the sketch number is shown as part of the original sketch data. Information crossed out on the original sketches will not be shown.
2-02. SCALE
a. Drafting. — Same as the scale of the original sketch except for exaggeration of certain features requiring modification.
*248 b.Reproduction. — Reduction of approximately forty percent.
* * * * *
2-04. GENERAL REQUIREMENT OF CONTROL SKETCHES (clarity and neatness) — Each sketch must be of such quality that it will:
a. With permanent objects, reference marks and measured distances shown, enable one to proceed (on ground) with certainty to the immediate vicinity of the control point.
b. Be an aid in identifying the point on aerial photography.
c. Be an aid in identifying the point on maps in case the point is not already shown on maps.
d. Not appear crowded or congested in the immediate vicinity of the control point.
2-05. OVERALL SIZE AND PROVISION FOR ORIENTATION OF SKETCH
a. The sketches as shown on the basic data are oriented north unless indicated otherwise; it is preferred that, in drafting these sketches, the same orientation be maintained as indicated thereon. No north arrow is necessary when the sketch is oriented north (when approximate north is parallel with the right-hand side of the sketch). If the size and arrangement of the sketch is such that it cannot be shown according to the first preference, the following alternatives are listed in order of preference. Rotate the sketch so that the north arrow is pointed due west (i.e., toward the body of the card) or northwest or northeast. If possible, the north arrow, when shown, should be positioned in approximately the same place on all sketches, preferably in the upper right-hand corner. All north arrows shall be uniform in length and line weight as furnished. The Contractor shall request north arrows (AMS cut No. 114) as needed.
'b. All sketches shall be shown within a blue-pencil, tick frame at either one or the other of two sizes. The area on the card form originally intended for a sketch is 2.85 inches in height (top to bottom) and 2.23 inches in width. * * * The dimension for height will never be exceeded, but the width may exceed the 2.23 inches and be extended to a width of 2.90 inches to include the desired sketch data where necessary. All sketches will be centered between the upper and lower work limits and abutted against the work limit on the right-hand side. When the sketch is confined to the original space, the ticks will be shown to include only the original space. If any of sketch extends to the left of the original space, *249 the ticks shall be shown to include all of the additional space. The tick frame will never exceed 2.85 inches in height and 2.90 inches in width. Approximate work limits are shown in pencil on copy furnished to contractor.
c. The above overall size and provision for orientation of sketches applies to all sketches with the exception of those marked for oversize. These sketches shaE be drafted to the work limits indicated on the original sketches furnished.
2-06. draeting — In general, the original sketches will be redrafted in accordance with modifications as follows:
(1) Each of the planimetric sketches on the basic data indicate control points by triangles circled in red pencil on the sketches furnished. Where two or more triangles are shown, the basic data indicates that additional sketches should be made accordingly. One and only one of the control stations will be shown as a triangle on each sketch to be drafted. The same station shall not be shown as a triangle on more than one sketch. The additional points shall be symbolized by a circle. All circles depicting control stations shall be approximately 0.08 inch in overall diameter. Distances between points indicated on the original shall be shown.
a. All information shown on the original sketch except Japanese characters[1] and that crossed out shall be shown. All information substituted or added shall be shown.
b. Most line weights on the original sketches range from .010 to .015 inch inclusive. Line weights in drafting will usually be copies [sic] from the original sketch unless there is a serious deviation from this range on the original. If there is a serious deviation from this range the Contractor shall modify the line weights to a weight within the range mentioned above. Line weights should be consistent throughout a sketch for any one feature. It is preferred that line weights for roads throughout each sketch be slightly heavier than line weights depicting other detail.
c. Lettering of all names, distances, trig station numbers, informative notes, etc., on the sketches must be done with clarity and neatness and should not be smaEer than .06 inch in height (including lower case letters). All upper case letters should bo approximately one tenth (0.1) inch in height and lower case letters should be within a range from six hundredths (0.06) inch to eight *250 hundredths (0.08) inch. Proper names, such as those indicating the destination of roads, should be drafted as shown on the samples.
d. All lettering referred to in paragraph 2-06 e [sic] sba.11 be oriented in accordance with normal practices, i.e., with the top of the letters toward the upper limits of the sketch and kept within the limits of penciled lines on original sketch furnished wherever possible.
e. The legs of all triangles representing control stations shall be approximately .15 inch in length with one leg aligned parallel with the lower work limits of the sketch. Deviations from the .15 inch are permissible if it does not create awkwardness in the appearance of the sketch.
f. Both the sheet number and point number (example: 5654 II (5)), which is shown in red pencil at the top of pages containing original sketches, shall be shown on each sketch beneath the lower work limits.
g. All sketches shall be drafted on tracing paper medium 31-40. A margin of one inch beyond the work limits or more shall be left on each sketch.
7. By letter dated February 21, 1955, plaintiff submitted five sample sketches to AMS for approval. By letter dated February 28, 1955, the contracting officer approved the sketches as being of acceptable quality and returned them to plaintiff.
8. Plaintiff commenced work on the contract on February 24, 1955. Lot 16 was the first put to process. Plaintiff, when submitting its bid, contemplated using a “production line.” Originally, AMS planned to award the work to a number of contractors. However, when it was concluded to award eight of the nine lots to plaintiff, AMS knew that an assembly line operation would be necessary for plaintiff to complete so many sketches in so short a time. Plaintiff divided the work on the planimetric sketches, which was the great bulk of the contract work, into four phases. The first group of draftsmen did the linework showing roads, streams, etc. The second added the lettering, by freehand, for names of towns, physical characteristics of the terrain, and directions of a view. The third group, using the mechanical Leroy process, added the identification at the bottom of the sketches, consisting of a “quad” number for the locating of a particular section of the country on a map, and a station number, *251 which, was a point in the quad. The sketches were then reproduced by a process similar to photostating. The photocopies (called check prints) and the source material were then passed on to the fourth group, consisting of inspectors or checkers, who compared the check prints with the source material. They ran a yellow pencil over the correct parts of the sketches as reproduced on the check prints. All errors and omissions were indicated by red pencil along with instructions for corrections. Deficient sketches, together with the check prints and the source material, were returned to the draftsmen for correction. As to the profile sketches, the drafting of the buildings and other structures were made by two or three draftsmen who did nothing else. This work was done prior to the so-called first stage linework, as described above. They were then processed through the other steps to the inspectors. Sketches were normally in process for 4 or 5 days. Approximately 40 employees were engaged on the project.
9. After being in production approximately a week, certain problems arose regarding various details in connection with the preparation of the sketches. Considering the nature of the project, the specifications did not cover many points which would necessarily arise in performing the contract, and AMS contemplated that from time to time oral instructions would be given with respect to such matters since it was not possible to cover each detail in writing. An attempt to draft such all-inclusive specifications or instructions would have unduly delayed AMS in completing the urgent end product, of which the preparation of the sketches was an early phase. On March 1, plaintiff’s official who was in charge of the project telephoned AMS to request that an AMS representative be sent to Aurora to offer guidance. Lot 11 was commenced the next day, March 2, and Lot 10 on March 3.
10. On March 8, an AMS cartographer employed in the Inspection Section of the Cartographic Division, who was variously referred to as an inspector or a field representative, and who was thoroughly familiar with the requirements of the project as they affected plaintiff, arrived at plaintiff’s plant and remained until March 10. Plaintiff’s officials took *252 the field representative through the drafting room in order to familiarize him with the methods being followed. Numerous specific points were discussed, such as the formation of symbols designating and distinguishing between evergreen and deciduous trees, the number of such symbols to be shown in order to avoid crowding, the omission of concentric arcs to indicate right angles, and the manner of depicting road intersections. The representative made suggestions and gave directions concerning these and a number of other matters. For instance, he advised that as much of the shading on profile sketches as possible be eliminated or lightened. During his visit, the representative was furnished several hundred finished sketches, together with the source material, from Lots 10 and 11 for examination and criticism. At that time, Lot 16 had been almost completely drawn and the field representative made a spot check of it. Under AMS practice, such a representative engaged in such an assignment is supposed to call attention to any errors which he discovers and especially to point out substandard workmanship. In this instance, there was no indication by the AMS representative that the work was not of acceptable quality or not in accordance with the specifications. He made no complaints to plaintiff of this nature. On the other hand, he made favorable comments concerning the quality of the work and its progress. As a result of the visit, plaintiff was convinced its work was satisfactory and acceptable. This conclusion on plaintiff’s part was reasonable. The representative specifically instructed plaintiff that his suggestions and directions with respect to work changes were not to apply to any sketches, either already completed or in process, where their application would necessitate the redoing of any work. Plaintiff cooperated fully with the representative and accepted all of his suggestions and instructions without protest or complaint.
11. On March 10,1955, while the AMS representative was still at plaintiff’s plant, the first lot drawn by plaintiff, Lot 16, consisting of approximately 1,800 sketches, was shipped to AMS. This lot was satisfactory and met the requirements of the specifications. It was formally accepted on April 28, 1955, by a letter over the signature of the contracting officer, which stated:
*253 The examination indicates that the sketches are of acceptable quality and are in compliance with the technical provisions of the Contract Specifications.
The lot did not reflect the suggestions and directions given by the AMS field representative during his 3-day visit to the plant, since it was substantially complete at the time of his visit and, as stated, the AMS representative’s instructions were that completed work was not to be redone to incorporate them. On a few sketches, AMS felt that certain minor corrections or changes should be made. Inasmuch as there was an urgent need for the sketches, and the changes were of a minor nature, AMS made the changes itself with its own personnel. Plaintiff was not requested to furnish personnel to make any corrections on the lot, and was not notified by AMS that AMS personnel was making any corrections or reworking any sketches in this lot. No complaints whatsoever were made to plaintiff by defendant with respect to Lot 16.
12. Lot 11, consisting of approximately 2,100 sketches, was shipped to AMS on March 16, 1955. Approximately half of Lot 10, consisting of approximately 1,400 sketches, was shipped on March 18, and the remainder of the lot was shipped on March 22. Work on approximately half of Lot 9 was commenced on or about March 14, and this half, consisting of approximately 1,200 sketches, was shipped on March 26. Accordingly, by March 26, all of Lots 16, 11, and 10 had been shipped, as well as half of Lot 9. Lots 10 and 11, and said half of Lot 9 were, as submitted, at least equal, if not better, in quality to Lot 16. Lots 10 and 11 were in process at the time the AMS representative was at plaintiff’s plant during his visit of March 8-10, 1955, and it was possible to incorporate in them many of Ms suggestions and directions. Work on Lot 9 was commenced after he left, so that it was possible to incorporate in these sketches all of his suggestions.
13. Under date of March 21, 1955, the contracting officer wrote plaintiff the following letter:
The following notes are to confirm the decisions brought up during the inspection visit * * * to your office 8-10 March 1955. It is emphasized that these *254 practices are not to apply to work already accomplished unless their use would materially improve the sketches.
1. All features, particularly roads, are to be drafted to the control point symbol, and not stopped short of the triangle or circle.
2. Road intersections will always be left open; to do otherwise indicates that one road is “blocked-off”.
3. Due to repeated reproduction, fine line work on the original sketches often has been considerably weakened, broken-up, or lost. Insofar as practicable, these symbols will be identified from other sketches and restored. This is particularly true of tree symbols, where a clear distinction between evergreen and leafy trees must be maintained.
4. The symbol indicating a 90° turn, used, in conjunction with the distances to a point, and consisting of two closely spaced concentric 90° arcs, will not be shown on those sketches.
5. The combined sheet and station numbers, inked below the drawings, may extend beyond the work limits on either side, and will not be abbreviated.
6. It is preferred that distances be shown in open spaces, with a leader line and arrow added for clarity, rather than showing the dimension crowded into a small space. It must be borne in mind that these sketches will be reduced 40% for printing, and that the dimensions must be easily readable when reduced.
7. When complete drafted sketches would exceed the maximum work limit of 2.90"X2.85", all critical points must be included within the work limits, and a reduction be made in some of the sketch distances, while maintaining the dimensions. When non-critical areas fall outside the maximum work limits, these areas will be omitted from the sketch.
8. Pre-trimmed tracing paper which does not have the specified one inch (1") margin may be utilized on this project rather than to delay production.. However, no paper with less than three-quarters inch (%") margin will be used.
There are returned herewith four (4) prints of original material, each with two (2) sketches attached. The following comments are also not applicable to work already accomplished, and are intended as an aid for the remainder of the project.
Sheet # 1: These sketches as prepared by your office are acceptable. However, it is felt that the combined plan and elevation should be centered as indicated.
Sheet #2: Whenever a plan and elevation identify the same point both are to be shown on one sketch (Sta. *255 134). The sketches prepared by this office are only an approximation of the desired treatment. The elevation drawing immediately below the sketch of stations and 135 need not be drawn because the point is not identified by number. In this case, however, if this _ elevation were to be drawn, it is desired that the building at the right edge be included within the sketch as more readily identifiable feature.
Sheet #3: This case is similar to Sheet #2. The instructions “Draw 2” are intended to indicate that two (2) plans are to be drawn, and since the elevation for Sta. 30 is not marked for omission, that elevation drawing is to be included on the plan for the same point. An approximation of the desired treatment is attached.
Sheet #4: In this case the instructions “Draw 2” indicate that two sketches are to be made, one for Sta. 574 and one for Sta. 1010. Similarly, two sketches are required for Stations 569 and 1009.
As stated during the inspection visit, it is extremely important that any and all reproductions prepared by your office, both of the original material and of the sketches prepared in accordance with the contract, be destroyed or returned to Army Map Service.
14. (a) The procedure within AMS for the acceptance of the sketches was as follows: The contracting officer delegated to the Cartographic Division of AMS the general supervision of the project. The AMS field representative who was sent to plaintiff’s plant was an employee in the Inspection Section of this Division. This Division made the initial determination of acceptability of any lot submitted. If it concluded that the lot was acceptable and met the specification requirements, it transmitted it to the Geodetic Division of AMS, which was charged with the responsibility of using the sketches in the formulation of the overall project of which the sketches were a part. This Division was the so-called “user” of the sketches. If this Division also found the lot acceptable and in compliance with the specifications, it so notified the Cartographic Division, which then drafted a letter for the contracting officer’s signature giving formal notification to the contractor of the acceptability of the lot, and advising that payment for it was authorized. However, if the Cartographic Division concluded that the lot submitted did not meet the specifications and was not acceptable, it was *256 authorized, without submitting the lot to the user Geodetic Division and without any further authorization from the contracting officer, to reject the lot and demand such further work as in its opinion was required to bring the lot up to specification requirements. As set forth above, Lot 16 was accepted by both divisions and the contracting officer in accordance with this procedure.
(b) The part of Lot 9 shipped on March 26 was received by AMS in Washington on March 27 or 28. Thereupon, an inspection and review of Lots 11 and 10, and said half of Lot 9, was made by the AMS field representative and his superior in the Cartographic Division, who had been specifically vested by the contracting officer with the general supervision of the project. Together and concurrently, they concluded that many of the sketches in these three lots were faulty and should be corrected or redrawn. They therefore decided to reject the lots and all the sketches in them, in toto, and to demand for these lots and for all future lots a higher technical quality of overall work, including better linework, lighter shading on 'building sketches, better formed brackets, and better lettering. They concluded, among other things, that the manner of depicting road intersections should be changed, that the concentric arcs indicating a 90° angle should be eliminated, although they were shown on the source material, and that the distinction between evergreen and deciduous trees should be improved.
The general higher standards which these AMS officials then felt should be applied to the sketches would unquestionably make finer sketches. However, since the lots as submitted were at least equal to, if not better than, Lot 16, which was acceptable and did meet the specifications, and which the contracting officer accepted as being in compliance with the technical provisions thereof and satisfactory for their intended purpose, the decision to reject these lots was arbitrary. Lots 10 and 11, as submitted, were of no worse quality than they were at the time the AMS field representative examined them while at plaintiff’s plant. Although the representative made no complaints about the sketches in these lots while at the plant which were of a nature to indicate that they were not on an overall basis in compliance with the *257 specifications, be now participated in the conclusion, formulated jointly with his superior, that the identical sketches should be rejected as not complying with the specifications.
15. In a telephone conversation on March 28, 1955, prior to the formal acceptance of Lot 16, plaintiff was advised by the Cartographic Division official in general charge of the project, referred to in finding 14 (b), that some of the sketches in Lots 11, 10, and 9, previously shipped, as set forth in finding 12, were of unsatisfactory quality and would have to be redrawn or reworked before they would be accepted. A representative of plaintiff came to Washington, D.C. the next day and conferred with officials of the Cartographic Division for approximately 3 hours. The field representative who had previously visited plaintiff’s plant and had participated in the decision to reject the lots, as set forth in finding 14(b), did not join in this conference. Plaintiff’s representative was advised of several reasons for the rejection, the reasons varying from sketch to sketch. He was informed that, in the opinion of AMS, the following defects appeared in many sketches and the following changes should be made: the brackets used in indicating distance would have to be better formed; better lettering work would be required; lettering should be less crowded; the outline and shading on the profile or building sketches should be lightened ; and there should be less congestion around the control points. Criticism was made of the manner in which the trees were shown, although they were shown on these lots in substantially the same manner as they had been shown on Lot 16. Eoad directional arrows were to be placed in the center of the road, rather than over or under it. Much of the criticism raised to the sketches were the same suggestions and directions that the AMS field representative had made during his visit to plaintiff’s plant and mentioned in the subsequent confirming letter, such as the elimination of the concentric arcs, and the method of distinguishing between evergreen and deciduous trees. As to the building shadings, the AMS officials indicated that the use of a pen called a “crow-quill” pen would give the kind of an etched appearance they desired and showed samples of the type of building sketches they wanted. Plaintiff’s representative, *258 without objection, took Lot 11 and part of Lot 10 back with him to Aurora. The balance of the sketches were returned to plaintiff by AMS the next day. There were approximately 6,200 sketches in the three rejected lots. The three lots were returned in toto although not all of the sketches required reworking. It was felt that, as a result of the conference, plaintiff could itself determine which of the sketches required correction or redrafting.
16. Plaintiff changed and redrew many of the sketches in the rejected lots in accordance with the instructions given by the AMS officials at the conference of March 29. The sketches, as corrected, were ultimately accepted by AMS as being in compliance with the technical provisions of the specifications, the acceptance letters with respect to them being identical with that set forth in finding 11 concerning Lot 16. As was true of Lot 16, AMS with its own personnel made some minor changes on the resubmitted lots. Plaintiff was never asked to and did not furnish personnel to make corrections on the sketches at AMS.
The remaining lots, 8, 12, 13, and 14, were shipped after April 1, 1955, and were also accepted as meeting the technical requirements of the specifications under identical acceptance letters. In all lots other than Lot 16, greater use of the crow-quill pen was made on the building profile sketches, thus producing a more etched appearance. This required a more skilled type of draftsman and took a longer time to draw. Greater use was also made of a mechanical method of making brackets, i.e., by the use of a templet, instead of making them freehand, thereby also taking greater time.
All of the lots were drawn to higher technical standards than Lot 16, and incorporated the directions made by the AMS officials at the March 29 conference, as set forth in finding 15. By letter of June 16,1955, the contracting officer sent a letter to plaintiff confirming certain comments and discussions by another employee of the Cartographic Division during a recent inspection trip covering the instant contract and another, and, with respect to the instant contract, stated that the employee had .examined a number of *259 sketches and that “the quality of the work was good. The few discrepancies noted were promptly corrected.”
17. Final formal acceptance of all work under the contract was made on July 1,1955. Shortly thereafter, a representative of the plaintiff conferred with the contracting officer and complained about alleged excess costs incurred in the performance of the contract as a result of being required to perform work over and above that required by the specifications. The contracting officer advised that submission of the claim should be made in writing, with a breakdown of the amounts claimed and the basis for the claim. By letter of September 23, 1955, plaintiff requested the contracting officer to delay the closing out of the contract in order that it could prepare its claim. Thereafter, by letter of October 4, 1955, plaintiff asked the contracting officer for additional compensation, contending it had been required to do work in excess of contract and specification requirements. Plaintiff complained that it had been required to include tree symbols on the sketches although it allegedly had been advised prior to bidding that tree symbols were not to be drawn; that a sample sketch in the specifications indicated that freehand curved brackets would be satisfactory but that sketches submitted containing freehand brackets of quality comparable to the sample were rejected; that the contract called for inked line weight from .010 to .015, but that buildings on sketches submitted drawn to these tolerances were rejected as being too heavy and that plaintiff was required to submit pictures resembling an ink etching, requiring the redrawing of over 1,000 building sketches for this reason alone; that defendant failed to provide samples as good as the work it ultimately required; that the excessive requirements imposed resulted in extra costs and an overall loss on the contract; and that on one lot (8) on which no redrawing was required, the normal contemplated profit resulted. Plaintiff claimed extra compensation in the amount of $16,208.53 on Lots 9, 10, 11, 12, 13, 14 and 16, being the difference between its alleged total costs on these lots and the contract price. The contracting officer, by letter of November 16,1955, to which were attached formal *260 findings of fact, denied plaintiff’s claim. The letter stated in part:
It is trae that the specifications regarding this type of work cannot be written in minute detail — certain phases have to be left to the qualifications of the contractor. Our inspector recalls a discussion with your representatives regarding showing of tree symbols and states that they were informed that tree symbols would be shown. * * *
Changes referred to in your letter were not changes in requirements or in the specifications, but were rejections for not complying with the specifications and therefore it is not felt that additional compensation is authorized.
It is true that sketches provided [i.e., the source material] were not a finished product. If they had been, there would have been no requirement for redrafting. As there were certain changes to be made in these drawings in accordance with the specifications furnished with the contract, and these changes varied, it was necessary that the material be reviewed before acceptance of any bid. This is the main purpose in inserting the paragraph in the invitation that no bid would be considered without reviewing the material.
‡ ‡ $
On November 28, 1955, plaintiff appealed to the Armed Services Board of Contract Appeals reducing its claim to $15,061.42 and eliminating Lot 16. The Board, after a hearing, held on August 7, 1957, that there was an ambiguity in the specifications with respect to the inclusion of tree symbols, but that plaintiff was given “clear and timely notice that tree symbols were required”, that “such notice removed any ambiguity as to tree symbols that the contract required the contractor to include tree symbols in sketches wherever they appeared in the source material” and that “the contract also required that appellant draw tree symbols so as to differentiate between evergreen and deciduous trees * * It concluded on the basis of the evidence presented with respect to the tree symbol issue and the other issues, including line weights and brackets, that plaintiff had failed to show it “was required to perform any work not required by the applicable contract specifications” or that it “was required to correct or *261 replace any sketches that complied with the contract requirements.”
18. On the basis of the testimony and exhibits before the Appeals Board, as well as the trial proceedings before this court, including further testimony, the Board’s conclusion with respect to the issue of the tree symbols which was presented to it is not arbitrary, is supported by substantial evidence, and is in fact correct. However, on the same basis, the conclusion that the rejection of Lots 11,10, and half of Lot 9 was justified and that plaintiff was not required to perform any work on these and the other lots thereafter submitted which was over and above that required by the specifications, is arbitrary and capricious, and is not substantially supported by the credible and probative evidence.
19. As set forth above, in its claim presented to the contracting officer and the Appeals Board, plaintiff complained that the contract did not contemplate that the contractor was to designate trees on the sketches, that, furthermore, plaintiff’s representatives were so told at the prebid conference by an authorized AMS official, and that defendant, in later requiring that tree symbols be added, became obligated to compensate plaintiff for the increased costs incurred by plaintiff in making such additions. Plaintiff, in its petition filed herein, as well as in the trial proceedings, made the same contention. However, after trial, plaintiff withdrew its claim based on such contention.
20. Pursuant to Rule 38 (c), the parties, with the approval of the commissioner, agreed that there should be a separate determination of the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
*262 In accordance with, the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on August 2, 1961, that judgment for plaintiff be entered for $5,000.

 Actually, there were no such characters on the source material.